# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

**UNITED STATES OF AMERICA**

**v.**                                         **Criminal No. 2:20-00054**

**NEDELTCHO VLADIMIROV**

## DEFENDANT'S MOTION TO REOPEN DETENTION HEARING AND RECONSIDER PRETRIAL RELEASE

The defendant, Nedeltcho Vladimirov, by his attorney, Assistant Federal Public Defender Rachel E. Zimarowski, moves this Court to reopen the detention hearing pursuant 18 U.S.C. § 3142(f)(2), conduct a detention hearing at the motions hearing presently scheduled for July 27, 2020, at 11:00 a.m., and reconsider its previous order of detention.

## I.     Procedural Background

On February 10, 2020, Mr. Vladimirov was arrested pursuant to a criminal complaint charging him with promotional money laundering in violation of 18 U.S.C. § 1956(a)(1)(A) and engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a). Dkt. Nos. 9, 13. The government requested a detention hearing pursuant to 18 U.S.C. § 3142(f)(2)(A), arguing that there was a "serious risk [Mr. Vladimirov] will flee." Dkt. No. 5. Following a detention hearing on February 13, 2020, United States Magistrate Judge Dwane L. Tinsley detained Mr. Vladimirov after finding "[b]y a preponderance of the evidence that no condition or combination of conditions of release will reasonably assure [his] appearance as required." Dkt. No. 18 at 2. In support of this conclusion,

Judge Tinsley cited "[l]ack of stable employment," "[l]ack of significant community or family ties to this district," "[s]ignificant family or other ties outside the United States," and "[b]ackground unknown or unverified." *Id.* at 3. He concluded:

> The defendant was born in Sofia, Bulgaria. He is a naturalized United States citizen, but maintains dual citizenship with Bulgaria. The defendant traveled internationally to Bulgaria in 2019 and has traveled to Spain and Germany in 2017. Recently, the defendant transferred a large amount of money to Bulgaria and possesses a valid passport. The defendant also has had multiple emergency protective orders placed against him. He was not able to provide a collateral contact to verify any information.

*Id.* at 3.

On March 10, 2020, a grand jury indicted Mr. Vladimirov on one count of engaging in a wire fraud conspiracy in violation of 18 U.S.C. §§ 1343 and 1349; one count of interstate transportation of stolen goods in violation of 18 U.S.C. § 2314; and one count of international money laundering in violation of 18 U.S.C. §§ 1343 and 1956(a)(2)(B)(i); and one count seeking forfeiture of $70,860.75 in seized funds as well as a money judgment of at least $250,000. Dkt. No. 21. Shortly thereafter, on March 18, 2020, the federal courthouses in the Southern District of West Virginia closed due to the ongoing COVID-19 pandemic. They did not reopen until July 1, 2020, over three months later.

During the shutdown, the undersigned was forced to file a motion to continue Mr. Vladirimirov's case on April 13, 2020. Dkt. No. 35. The government, also citing

the shutdown, filed a similar motion to continue on June 16, 2020. Dkt. No. 39. This same date, the undersigned has been forced to file yet another motion to continue due to ongoing problems with both investigating Mr. Vladimirov's case and communicating with him during his confinement at South Central Regional Jail ("SCRJ"). The ongoing delay to Mr. Vladimirov's case, and the rapidly-increasing risk to his health presented by his continued confinement, is untenable.

## II. Changed Circumstances

Mr. Vladimirov has been incarcerated at South Central Regional Jail ("SCRJ") since his initial arrest on February 10, 2020. He asks this Court to reopen his detention hearing and reconsider its previous detention order in light of the changed circumstances of the COVID-19 pandemic, his own underlying health issues, the deleterious effect of his pretrial confinement on his ability to communicate with counsel, and his new plan to be released to the residence of his friend, Ivailo Lenkov, who lives in Point Pleasant, West Virginia.[1]

### A. COVID-19 Pandemic and SCRJ

As of July 20, 2020, SARS-COV-2, a novel coronavirus causing COVID-19, has infected over 14.6 million people worldwide, leading to at least 607,926 deaths, and 140,800 deaths in the United States.[2] In West Virginia, 5,142 people have been

---

[1] It is the undersigned's understanding that the U.S. Probation Office is not yet doing home inspections, but Mr. Lenkov is willing to complete the same in advance of the hearing should Probation change its position.

[2] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (July 20, 2020), *available at* https://nyti.ms/2U4kmud (updating regularly).

infected, and the number of deaths recently reached 100.[3] Cases within the state are continuing to rise, and the situation is increasingly dire:



In Kanawha County alone, over 112 new cases of the virus were reported just last week:

---

[3] *West Virginia COVID-19 Dashboard*, West Virginia Department of Health and Human Resources ("DHHR") (July 20, 2020), available at https://dhhr.wv.gov/COVID-19/Pages/default.aspx (updating regularly).

Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[4] Inmates cycle in and out of pretrial facilities, and people who work in the facilities leave and return daily. Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in federal pretrial detention centers.[5] Many people who are incarcerated also have chronic conditions which makes them vulnerable to severe forms of COVID-19. According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[6] Many courts have recognized the special danger posed by the spread of COVID-19 in prisons and detention centers. *See, e.g.*, *Durel B. v. Decker,* No. CV 20-3430 (KM), 2020 WL 1922140, at *2 (D.N.J. Apr. 21, 2020) (observing the "stark reality is that avoiding exposure to COVID-19 is impossible for most detainees and inmates" (internal quotation marks omitted)).

West Virginia jails are particularly vulnerable to COVID-19. SCRJ, for example, is consistently over-capacity, crowding people into cramped spaces where

---

[4] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *available at* https://doi.org/10.1086/521910.

[5] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *available at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf

[6] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *available at* https://bit.ly/2W9V6oS.

illness can spread more easily. In 2018 (the most recent year of available data), SCRJ had an average daily population of 530 people – in a facility designed for 298 people.[7] In 2018, the Regional Jail Authority reported that 7,352 entered South Central Regional Jail and 6,755 left the jail to return to the community or other facilities.[8] This massive turnover in jail population pushes illness into the surrounding communities, affecting countless others—jail employees, law enforcement, probation officers, attorneys, judges, courthouse staff—who come in contact with a person from the point of incarceration to release.

### 1. Mr. Vladimirov's underlying health issues.

As reflected in the pretrial services report ("PTSR"), Mr. Vladimirov is in an at-risk age bracket—he is 52 years old—and suffers from hypertension and sleep apnea. *See* PTSR at 3. His age and health conditions place him at a heightened risk of severe illness and death should he contract the virus.

The CDC recently confirmed that hypertension, or high blood pressure, is associated with more severe cases of COVID-19.[9] Sleep apnea, while not yet confirmed by the CDC to be a risk factor, has been preliminarily identified as such by

---

[7] Annual Report FY 2018, W. VA. REG. JAIL & CORRECTIONAL FACILITY AUTHORITY 20, 10 (2018).
[8] Annual Report FY 2018, W. VA. REG. JAIL & CORRECTIONAL FACILITY AUTHORITY 21 (2018).
[9] *People at Risk for Serious Illness from COVID-19*, CDC (July 20, 2020*), available at* https://bit.ly/2vgUt1P; *see also United States v. White*, No. 13-CR-20653, Dkt. No. 51-1 (E.D. Mich. May 11, 2020) (Aff. of Epidemiologist Katie Lin Brasher-Beaudry), at 8 ("[T]he majority of credible data and research related to the relationship between hypertension and COVID-19 suggests that hypertension puts patients at a higher risk of becoming ill with COVID-19, experiencing severe symptoms, being hospitalized and/or dying.").

researchers.[10] Mr. Vladimirov's age of 52, especially when coupled with these underlying conditions, places him firmly in a category of at-risk and particularly vulnerable inmates.[11]

## 2. Communication Problems

Since the pandemic began, the undersigned's ability to communicate with Mr. Vladimirov has been greatly hindered. Although the undersigned has attempted to consult with him remotely via three different methods, none has been satisfactory. First, Mr. Vladimirov may call the undersigned via the public phones in his pod. These shared phones are located in a noisy public area, making privacy impossible, and automatically disconnect after 15 minutes. Second, the undersigned has attempted to conduct conference calls with Mr. Vladimirov using the phones located in various staff members' offices. Although these calls are an improvement over the pod phones in that they can at least last longer than 15 minutes, a staff member always remains in the room—watching Mr. Vladimirov and listening to his every word. This monitoring, according to the jail, is mandatory and non-negotiable. This is unacceptable. *See United States v. Brugman*, 655 F.2d 540, 546 (4th Cir. 1981) ("The essence of the Sixth Amendment right to effective assistance of counsel is,

---

[10] See, e.g., Sally Robertson, B. Sc*., Sleep apnea may increase the risk of severe COVID-19, say researchers*, www.news-medical.net (May 19, 2020), *available at* https://www.news-medical.net/news/20200519/Sleep-apnea-may-increase-the-risk-of-severe-COVID-19-say-researchers.aspx.

[11] *Older Adults*, CDC (July 20, 2020) ("Among adults, the risk for severe illness from COVID-19 increases with age, with older adults at highest risk."), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

indeed, privacy of communication with counsel." (citing *Glasser v. United States*, 315 U.S. 60, 62 (1942)). Finally, the undersigned has been able to arrange a video conference with Mr. Vladimirov. These video calls suffer from same infirmity discussed above, i.e., a staff member sits in the room with the inmate for the entire duration of the call. Further, the inmate does not have a handset or headphones, and the staff member can clearly hear both sides of the call through the computer's speakers. The presence of the staff member, again, is purportedly mandatory.

Mr. Vladimirov's case is further complicated by another factor: the language barrier. The ability to observe another person's face is important for nearly all effective communication, but it is particularly so when the parties to a conversation begin at a disadvantage—both Mr. Vladimirov and the undersigned must concentrate carefully, and observe each other freely, in order to effectively and fully communicate. Phone calls are simply insufficient. Even in-person meetings, which present their own challenges in terms of health and safety, are problematic due to masking and distance requirements. The only suitable alternative in the current environment is video conferencing, but this can only be effective without a correctional officer listening to every word. Such communication can only be achieved if Mr. Vladimirov is released from custody and permitted to access video conferencing equipment while on bond.

## III. Release Plan

Mr. Vladimirov proposes that the Court consider releasing him to Mr. Lenkov's residence in Point Pleasant, West Virginia, with conditions that restrict him to home

confinement and ensure that the U.S. Probation Office can constantly surveil him with electronic monitoring. The Court's initial concern as to his flight risk has largely evaporated during the course of this crisis. Bulgaria, and the European Union, has greatly restricted access to its borders, and international travel is exponentially more difficult now that it was just months ago. Mr. Vladimirov will turn over his passport and agree to stay inside Mr. Lenkov's house all day, every day, and a probation officer can check on him at will via a monitoring service installed in his cell phone and/or constantly monitor his location via GPS. As one legal scholar observed,

> Increasingly sophisticated remote monitoring devices have the potential to sharply reduce the need for flight-based pretrial detention . . . . [T]he question of finding other ways of ensuring a non-dangerous defendant's presence at trial is one not of ability, but of will[.]

Samuel R. Wiseman, *Pretrial Detention and the Right to the Monitored*, 123 Yale L. J. 1344, 1347–48 (2014).

Mr. Vladimirov has no reason to flee. He realizes that Bulgaria has an extradition treaty with the United States that covers his offenses. He realizes that he cannot travel to Bulgaria without a passport. He has been accused of a relatively low-level fraud, the government has seized all of his fungible assets, and he is determined to clear his name. It is 2020—there are alternatives to incarceration where the only identified risk is one of flight.

## IV. Conclusion

Mr. Vladimirov is among a vulnerable population at heightened risk of getting very sick from this illness. From his perspective, his life—not only his liberty—is on the line, creating a powerful incentive to abide by any release conditions the Court may impose.

WHEREFORE, for these reasons, Mr. Vladimirov respectfully requests the Court conduct a detention hearing on July 27, 2020, at 11:00 a.m., and reconsider pretrial release.

Date: July 20, 2020.                                     Respectfully submitted,

**NEDELTCHO VLADIMIROV**

By Counsel

**WESLEY P. PAGE**
**FEDERAL PUBLIC DEFENDER**

**s/Rachel E. Zimarowski**
Rachel E. Zimarowski, WV Bar No. 11415
Office of the Federal Public Defender
300 Virginia Street, East, Room 3400
Charleston, WV 25301
Telephone: (304) 347-3350
Facsimile: (304) 347-3356
E-mail: Rachel_Zimarowski@fd.org